## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**LYLE G. SMITH,**

                    **Plaintiff,**

        **vs.**

**CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,**

                    **Defendant.**

**CASE NO.  8:13CV154**

**MEMORANDUM
AND ORDER**

Lyle G. Smith filed a complaint on May 17, 2013, against Carolyn W. Colvin, the

Acting Commissioner of the Social Security Administration.  (ECF No. 1.)  Smith seeks

a review of the Commissioner's decision to deny his application for supplemental

security income benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C.

§§ 1381 et seq. The defendant has responded to Smith's complaint by filing an answer

and a transcript of the administrative record.  (See ECF Nos. 9, 10).  In addition,

pursuant to the order of Senior Judge Richard G. Kopf, dated July 31, 2013, (ECF No.

13), each of the parties has submitted briefs in support of his or her position.  (See

generally Pl.'s Br., ECF No. 14; Def.'s Br., ECF No. 19, Pl.'s Reply Br., ECF No. 20).

After carefully reviewing these materials, the Court finds that the Commissioner's

decision must be affirmed.

### I. PROCEDURAL HISTORY

Smith filed an application for disability benefits under Title XVI on July 7, 2010.

(Tr. 166). His claim was denied initially on September 30, 2010, and on reconsideration

on November 5, 2010. (Tr. 106, 113). Smith requested a hearing before an

1

administrative law judge (ALJ) (tr. 117), and the hearing was held on February 15, 2012. (Tr. 28-61). In a decision dated March 23, 2012, the ALJ found that Smith had not been under a disability since July 7, 2010, the date of the application for benefits. (Tr. 10).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See id.

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Smith was not engaged in substantial gainful activity.

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c).

2

The ALJ found that Smith had the following severe impairments: seizure disorder, depressive disorder/dysthymia, and marijuana dependence. (Tr. 12). The ALJ determined that although Smith had been diagnosed with hypertension, it was controlled with medication when taken as prescribed, and Smith had not established that the hypertension had imposed any significant limitations on his ability to perform basic work activities. (Tr. 12). In addition, Smith alleged disability due to chronic back pain, acid reflux, restless leg syndrome, incontinence, poor eyesight, and obesity. He did not establish that any of these impairments imposed any significant limitations on his ability to perform basic work activities. (Tr. 12-14).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a). The ALJ found that Smith did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the

---

[1]    "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f).  The ALJ found that Smith was capable of performing past relevant work as an auto detailer. (Tr. 20).

At step five, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. If the claimant is able to do other work, he is not disabled. The ALJ determined that Smith had the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c), meaning that he maintained the ability to lift up to 50 pounds on occasion and 25 pounds on a frequent basis and could stand for six hours and sit for six hours during an eight-hour day. He had unlimited use of his extremities. He could occasionally climb stairs and even ladders, although he should avoid frequently doing so. He should avoid exposure to concentrated vibration, hazards, such as heights and machinery, and commercial driving. He was limited to simple work with no detailed instructions or being able to follow detailed instructions. The ALJ stated that Smith should not work with the general public where there would be a lot of interaction. He had no problems with concentration, but sometimes had loose association which might be a limitation. Smith interacted well with others, but had some minor limitation in dealing with changes, so, the ALJ stated that Smith should seek work with a more repetitive nature. (Tr. 15).

The ALJ found that Smith was not disabled and would be able to perform the requirements of representative occupations such as hospital or industrial cleaner, kitchen helper, garment sorter, and housekeeper, all of which had a significant number of jobs in the regional and national economy. (Tr. 21).

The Appeals Council of the Social Security Administration denied Smith's request for review on March 22, 2013. (Tr. 1-5.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Smith seeks judicial review.

## II. FACTUAL BACKGROUND

### A.   Medical Evidence

Smith, who was born on April 16, 1962, (Tr. 92), asserted that he had a number of health concerns, including seizure disorder, chronic back pain, incontinence, obesity, depression, and anxiety disorder.  (Tr. 94). His application for benefits alleged an onset date of May 7, 2005, but he later amended the onset date to July 15, 2010. (Tr. 190). The record does not indicate that any specific event led to his health issues.

Smith was diagnosed with a convulsive disorder after having a seizure and being taken to the hospital on July 8, 2008. (Tr. 279). He had a second seizure in the hospital. (Tr. 294). A CT scan found no acute intracranial hemorrhage. (Tr. 301). He was discharged on July 10, 2008, after being given a prescription for Dilantin. (Tr. 280). The record does not include evidence of any further seizures.

Rachel Kozol, APRN, treated Smith from August 2005 to December 2011. (Tr. 335-38, 442-600). Her treatment notes reflect that Smith's depression and anxiety were the most common topics for their appointments. In January 2010, Smith reported that his depression and anxiety had been controlled but he had low frustration tolerance, got easily overwhelmed, had poor self-esteem, and was preoccupied with not being able to

date. (Tr. 422). His mood was neutral and his affect was congruent. (Tr. 422). His GAF[2] was 50. (Tr. 423). By May 2010, Smith reported improvement in his depression and anxiety with Cymbalta. (Tr. 418). He reported no stress, but had chronic back pain. His mood was euthymic and his affect congruent. (Tr. 418).  His GAF was 55. (Tr. 419).

Kozol's notes show that in June 2010, Smith reported that his overall depression had been controlled, and he continued to use marijuana on an intermittent basis. (Tr. 424). By January 2011, Smith reported no depression or anxiety, but he said his energy level was low. (Tr. 508). His mood was euthymic and his GAF was 55. (Tr. 509). In August 2011, Smith continued to deny any depression, but he had some anxiety related to chronic back and neck pain. (Tr. 500). His mood was euthymic and his affect was congruent. (Tr. 500). His GAF was 55 and he was making fair progress toward his goals. (Tr. 501). In December 2011, Smith again denied any depression or anxiety. (Tr. 599). He reported some marijuana use to deal with chronic back and neck pain. (Tr. 599). Kozol stated that Smith's GAF remained at 55. (Tr. 600).

Beginning in March 2009, Smith attended a daily rehabilitation program at Community Alliance Rehabilitation Services in Omaha. (Tr. 341). In an initial assessment, Smith identified his concerns as decreased sleep, isolation, depression, crying, and excessive worrying. (Tr. 341). He was diagnosed with major depression disorder and cannabis dependence, and his GAF was 55. (Tr. 341).  He described his depression symptoms as crying spells, isolation, negative thoughts about his past

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

mistakes, hopelessness, and suicidal thoughts. He rated his current level of depression as a four on a scale of one to 10. (Tr. 342). Smith denied any problems maintaining focus or concentration, but he worried about finances and disappointing his family. He coped by going to church, sewing, doing crossword puzzles, or woodworking. (Tr. 342). He appeared depressed and had a blunted affect. His judgment and insight were intact.

A physical health assessment on March 18, 2009, at Community Alliance showed that Smith's physical health was average. He reported low back pain but was unsure of the cause. (Tr. 344). He stated that he took medication for hypertension and elevated cholesterol. (Tr. 345). Smith rated his physical health as nine on a scale of one to 10 with 10 being "healthy as a horse." (Tr. 346).

A mental health assessment at Community Alliance on March 25, 2009, reported that Smith had euthymic mood and congruent affect. (Tr. 346). He stated he would like to work but was not sure what kind of work he wanted to do. (Tr. 347). Smith was able to take care of his own personal hygiene and safety. (Tr. 347). He was able to maintain his home, shop for groceries, and prepare his own food. (Tr. 347). Smith reported using cannabis for back pain, muscle spasms, and sleep. (Tr. 349). Although he admitted to being a marijuana addict, Smith did not want to receive treatment and did not believe that Alcoholics Anonymous or Narcotics Anonymous would be helpful. (Tr. 349).

Smith continued participation in programs at Community Alliance until 2012. In September 2011, treatment notes indicate that Smith had maintained boundaries with peers and family. He was regularly attentive and engaged in group settings and generally positive in outlook and presence. He was at medium risk of relapse with excellent understanding of mental health issues. (Tr. 531). On January 31, 2012, it was

reported that Smith maintained excellent activities of daily living and a positive outlook. (Tr. 609). He maintained a leadership role in the program. He continued to seek representation for disability, but expressed acceptance of his living situation "as is." He was at medium risk of relapse due to a history of marijuana use, but he was in the maintenance stage of recovery. (Tr. 609).

Rodger Gerberding, a team leader at Community Alliance, wrote a letter on February 10, 2012, in which he stated that Smith attended the day rehabilitation program on a regular basis with enthusiasm. (Tr. 615). He was focused, good-humored and approachable with continual symptoms of grief, tearfulness and helplessness. (Tr. 615). It was recommended that Smith continue with the program for ongoing mental health stability. A disability award would significantly improve his quality of life in terms of supporting ongoing recovery and increased self-esteem. (Tr. 616).

On January 30, 2012, Smith went to the County Health Center to seek care for back pain and poor bladder control. (Tr. 604). He reported that he had more pain during cold weather. Smith said his anti-inflammatory medication was not as helpful as it had been, and he reported side effects from the bladder control medication. The examiner diagnosed back pain with "some mild radiculopathy," obesity, depression, and urinary incontinence. (Tr. 603). Smith's anti-seizure medication was refilled and he was advised to lose weight. Testing was ordered to determine the source of Smith's incontinence. (Tr. 603).

## B.   Medical Opinion Evidence

Smith was referred by Disability Determinations for a psychological interview with Amy T. Corey, Ph.D., on August 25, 2008.  (Tr. 307). Smith reported that between the

8

ages of 13 and 40, he smoked two to three marijuana cigarettes daily. At the time of the interview, he reported smoking half a cigarette two to three times a week for pain management. (Tr. 309).

Smith reported his last job had been as a delivery driver, which he quit because he had difficulty with his eyesight and depression. He had been unemployed for the last six or seven years. (Tr. 309). Smith reported that four years earlier, he experienced depressed mood and cried a lot. Since that time, he had made positive changes and felt better. He participated in church and attended a support group. He received emotional support from friends and family. He was taking Zoloft, but was not involved in individual counseling and had not had any inpatient treatment. (Tr. 309). He stated that he felt stressed about his finances. (Tr. 310).

Corey noted that Smith's general fund of information was within normal limits. His ability to do abstract reasoning was intact and his organization of thought was coherent and logical. His mood was euthymic and his affect appropriate. She estimated his intelligence to be low average. (Tr. 310). Corey stated that Smith did not appear to have restrictions in his activities of daily living or in maintaining social functioning. He did not have recurrent episodes of deterioration when stressed. He was able to sustain concentration and attention needed for task completion. He was able to understand, remember, and carry out short and simple instructions under ordinary supervision. He was able to relate appropriately to coworkers and supervisors and to adapt to changes in his environment. She diagnosed him with depressive disorder, not otherwise specified, and history of cannabis dependence. (Tr. 311). His GAF was 70. (Tr. 311). Corey stated that Smith's mental health prognosis was good at the time. (Tr. 312).

Daniel Fudge, Ph.D., conducted a psychological interview of Smith on September 10, 2010. (Tr. 429). Smith reported that he quit his job as a delivery driver in 2002 because he had depression, problems with his eyesight, and did not want to drive in the winter. He quit a job prepping rental cars after seven months because he did not like working outside in the winter. (Tr. 429). Smith reported that his depression became a problem in 2003-04 because he was unemployed. He said he stopped looking for work because he could not take any more rejection. (Tr. 430). Smith said he lacked self-confidence, cried, felt more emotional, and had panic attacks three or four times a month, lasting between 15 minutes and three hours. Smith stated that his social function and employment prospects were limited because he did not want to be around other people and disliked groups. He reported some periods of remission when he attended the rehabilitation day program at Community Alliance. (Tr. 430).

Fudge stated that Smith's mood was upbeat and his affect was normal. (Tr. 431). There were no observable signs of anxiety, tension, psychomotor disturbance, or substance abuse. (Tr. 431). Smith appeared to have no restrictions of daily activities or difficulty maintaining social functioning. He appeared to be able to remember simple and complex instructions and he could complete tasks under ordinary supervision. He did not appear to have any difficulty relating appropriately to others. His concentration and attention appeared to be adequate. He would have no difficulty adapting to changes in life or structure. Fudge diagnosed Smith with depressive disorder not otherwise specified. His GAF was 60. (Tr. 431). Fudge stated that Smith had a good mental health prognosis. His depression was related to being unemployed. If he became employed,

his depression should stop. If he went to therapy, he could learn strategies that would help him cope with his feelings and relieve his symptoms significantly. (Tr. 432).

A mental RFC assessment by Linda Schmechel, Ph.D., on September 23, 2010, showed that Smith was not significantly limited in the ability to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; and to make simple work-related decision. (Tr. 443). He had moderate limitations in the ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without any unreasonable number and length of rest periods. (Tr. 443-44). Smith had no significant limitations in social interaction or adaptation. (Tr. 444). The RFC showed that Smith had moderate limitations with complex, detailed tasks, but he should remain capable of simple tasks. (Tr. 445). Schmechel said Smith had moderate limitations in concentration based on his report of racing thoughts, loose associations, and flights of ideas. He appeared to have no significant limitations in social functioning because he interacted with providers and family and attended church and therapy at Community Alliance. Due to anxiety, he had only minor limitations in dealing with changes. (Tr. 445).  Schmechel noted that the mental RFC completed by Kozol in December 2009 showed some marked limitations, but it was not from an acceptable medical source and was not consistent with the bulk

11

of the medical evidence. (Tr. 446). Schmechel stated that although Smith had a history of depression and anxiety, he should remain capable of work as outlined in the RFC with no more than moderate limitations. (Tr. 446). A psychiatric review technique form completed by Schmechel noted mild restrictions in activities of daily living and difficulties in maintaining social functioning. (Tr. 448-58). Smith had moderate difficulties in maintaining concentration, persistence, or pace and no repeated episodes of decompensation. (Tr. 458). Patricia Newman, Ph.D., affirmed Schmechel's mental RFC. (Tr. 493).

On September 10, 2010, Tyler Price, M.D., examined Smith for a disability physical. (Tr. 434). Price reported that Smith had a good mental state and communicated effectively with good attitude and cooperation. (Tr. 436). He was able to follow all instructions with no difficulty. He was able to walk around the clinic without any difficulty and to get up from a sitting to standing position. He was able to go from a standing to laying position on the table, and then back off the table without any difficulty. He did not express any pain during the exam. (Tr. 436). The back exam showed that standing, cervical, thoracic, and lumbar curves were within normal limits. (Tr. 437). He had no crepitus in the extremities and had a non-antalgic gait. He did not use an assistive device or orthotics. (Tr. 438). He had strength in the upper and lower extremities and in his handgrip. Price found no physical limitation during the range of motion testing. (Tr. 438). Price's impression was that Smith had back pain, seizure disorder, depression, and vision changes. (Tr. 438). Price noted that Smith had no limitations and could lift weight without difficulty. He followed all instructions and was easily guided without difficulty. The seizure disorder appeared to be well controlled with

12

medication. Smith had no visual acuity or field deficits. (Tr. 439). Price noted that the radiology report of the lumbar spine found mild chronic compression of five to 10 percent. Intervertebral spaces were well preserved, and there were mild arthritic changes. (Tr. 442).

A.R. Hohensee, M.D., completed a physical RFC on September 24, 2010. (Tr. 463-70). He determined that Smith could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. (Tr. 464). Smith could stand and/or walk about six hours in an eight-hour workday and could sit about six hours in an eight-hour workday. (Tr. 464). He was unlimited in his ability to push and/or pull. (Tr. 464). Smith could occasionally climb ramps or stairs, but should avoid climbing ladders or scaffolds due to the history of seizure disorder. (Tr. 465). He had no other limitation in postural movements. (Tr. 465). Smith had no manipulative, visual, or communicative limitations. (Tr. 466-67). Smith had no environmental limitations except that he should avoid concentrated exposure to vibration and hazards. (Tr. 467).

Dr. Hohensee found that Smith's spinal curves were within normal limits and that he had full range of motion. A lumbar x-ray showed mild arthritic change and mild chronic compressions. Smith's extremities showed no crepitus or restriction of range of motion and he had a normal gait. Smith told Dr. Hohensee that he watched television five to seven hours a day, but had trouble sleeping due to back pain. Smith reported that he had less pain if he was less active. Dr. Hohensee stated that the report from Smith's sister as to his limitations appeared only partially credible because its allegations were not supported by the medical evidence. Smith did not appear to be

13

restricted by pain in his back. Dr. Hohensee said Smith should remain capable of work as outlined in the RFC. (Tr. 470).

On November 4, 2010, Jerry Reed, M.D., completed a physical RFC after reviewing updated medical evidence. (Tr. 495). Dr. Reed affirmed the existing RFC and noted that its finding of medium work with seizure precaution remained appropriate. (Tr. 495).

## C.    Other Evidence

In interrogatories filed on October 3, 2011, Smith stated that he could not work because he had extreme pain in his back and neck, restless leg syndrome, poor eyesight, and overactive bladder. (Tr. 252). Smith stated that he had pain when had to bend over, stand, sit, walk, kneel, or crouch, and sitting was a big challenge because of his back and legs. (Tr. 252). He stated that medications were effective, but they caused fatigue. (Tr. 254). Smith had attended physical therapy but he had to take a bus, which took too much time, so he had started doing exercises at home. (Tr. 255). He said he could stand for 30 minutes in an eight-hour day, walk for 15 minutes, and sit for 2½ to 6 hours. (Tr. 256). Smith stated he had been sent to vocational rehabilitation by Douglas County General Assistance, but after two hours they told him he did not qualify because his medical provider stated he had no physical restrictions. (Tr. 257).

## D.    Hearing Evidence

At a hearing on February 15, 2012, Smith said he was disabled because of the severity of his back problems and his poor eyesight. (Tr. 28-29). He was not currently receiving treatment for his back. (Tr. 35). He also said he had problems with bladder

control and restless leg syndrome, for which he took medication that helped part of the time. (Tr. 34).

Smith said his back pain affected his daily routine because he needed to be able to walk around or lean against a wall. He could not sit for a long time without severe pain. (Tr. 40). He said his pain affected his sleep and he had trouble concentrating. He felt anxious and depressed at times. (Tr. 40). He said he could sit 20 or 30 minutes before the pain got too bad. (Tr. 41). In an eight-hour period, he had to take 10 to 12 breaks of from five to 20 minutes. (Tr. 41).

Smith said his depression was worse after a severe pain episode, which occurred four or five times a week. (Tr. 42). He said medication helped his depression 75 percent of the time. (Tr. 43). He could not say how his depression affected his job performance because he had not been working since taking medication. (Tr. 43). Smith said he had to use the restroom about every 30 minutes and woke up about five to six times in a night. (Tr. 43).

Smith said the restless leg syndrome required him to take off his socks and shoes to massage his feet to stop the burning four or five times a day. Since taking medication, he needed to massage his feet once or twice a day. (Tr. 45). Smith said he used marijuana to help him sleep about once or twice a week and most recently had used it four days earlier. (Tr. 45).

Theresa Wolfert, the vocational expert (VE), opined that Smith would be able to work at his past job as an auto detailer. (Tr. 56-57). Wolfert also identified other jobs that Smith should be able to do with the limitations identified by the ALJ. Smith could work as a hospital cleaner, of which there were 17,068 jobs in the region and 371,379

jobs in the country. He could also work as an industrial cleaner, of which there were 51,667 jobs in the region and 1,060,237 jobs in the country. Smith could work as a kitchen helper, of which there were 10,840 jobs in the region and 505,950 jobs in the country. Those jobs were all considered medium physical capacity. In the category of light physical capacity, Smith could work as a garment sorter, of which there were 5,578 jobs in the region and 127,194 in the country. He could also work in housekeeping, of which there were 17,068 jobs in the region and 371,379 jobs in the country, and as a production solderer, of which there were 2,606 jobs in the region and 37,901 jobs in the country. (Tr. 57-58).

## III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations,

brackets, and internal quotation marks omitted). *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003). *See also Collins*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

### A.   Kozol's Opinion

Smith first argues that the ALJ abused his discretion and erred in failing to give sufficient weight to the opinion of Kozol, a nurse practitioner. Kozol submitted a report on December 30, 2009, in which she opined that Smith had dysthymia and was not employable. The report was on a form similar to those used by state agency specialists. On it, Kozol indicated that Smith had moderate limits in the ability to understand, recall, and carry out very short and simple instructions, and to perform activities within a schedule, maintain regular attendance, and be punctual within customary limits. (Tr. 335). Kozol said Smith had marked limits in the ability to remember locations and work-like procedures, to understand, recall, and carry out detailed instructions, to maintain

attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being a distraction to them, to make simple work-related decisions, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and adhere to basic neatness and cleanliness, to be aware of normal hazards and take appropriate action, and to travel in unfamiliar places or use public transportation. (Tr. 335-37).

Kozol said Smith was extremely limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and at a consistent pace without unreasonable number and length of rest periods, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently. (Tr. 336-37). Kozol stated that Smith had marked restriction of activities of daily living and difficulties in maintaining social functioning. (Tr. 337). She said he had constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner in a work setting or elsewhere. (Tr. 337). Kozol stated that Smith had one or two episodes of deterioration or decompensation in work or work-like settings which caused him to withdraw from that situation or to experience exacerbation of signs and symptoms. (Tr. 338). Kozol stated that Smith had depression, fatigue, and impaired cognition, as well as hypertension and back pain. (Tr. 338).

The ALJ gave no weight to the one-time opinion of Kozol, for several reasons. (Tr. 19). Her opinion of December 30, 2009, was made more than six months before the amended alleged onset date of disability. The evidence, including Kozol's own treatment notes, did not support her opinion that Smith's depression caused marked limitations in understanding and memory and sustaining concentration and persistence as well as social interaction. Kozol's opinion was provided through the use of a pre-printed form questionnaire which was submitted by Smith's attorney. The ALJ stated that the report's credibility was affected because it included a number of leading questions and similar inducements. "The form was not designed for objectivity, but rather for verification of some preconceived suggested conclusions about Smith's allegedly diminished health and fitness," the ALJ noted. He found that the form was intended to further Smith's litigation interests more than his medical interests, and it was fundamentally suggestive to support Smith's case. (Tr. 19).

Kozol is a nurse practitioner who treated Smith for several years. Although she had a treating relationship with Smith, her opinion is not necessarily accorded the same weight as a physician. Pursuant to 20 C.F.R. § 404.1502, a treating source is the claimant's own *physician* who provides the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. Acceptable medical sources include licensed physicians and psychologists. 20 C.F.R. § 404.1513(a). A nurse practitioner is classified as another medical source, who *may* provide evidence to show the severity of impairments and their effect on the claimant's ability to work. 20 C.F.R. § 404.1513(d)(1).

An ALJ will give controlling weight to a treating source's opinion if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005), citing 20 C.F.R. § 416.927(d)(2).   In this case, Kozol's treatment notes do not support her opinion that Smith suffered from dysthymia and was not employable. Kozol's treatment notes after the date of the alleged onset of disability show that Smith reported that his depression and anxiety had been controlled. (Tr. 422). Kozol stated that Smith's mood was neutral. (Tr. 422). In May 2010, Kozol noted that Smith's mood was euthymic, and his GAF was 55. (Tr. 418-19). Smith reported that his overall depression had been controlled in June 2010. (Tr. 424). Kozol stated that Smith's progress was good. (Tr. 425). By January 2011, Smith reported no depression or anxiety, and Kozol noted that his mood was still euthymic. (Tr. 508). In December 2011, Smith continued to deny any depression or anxiety. (Tr. 599). Kozol stated that his GAF remained at 55. (Tr. 600). Thus, Kozol's opinion was not consistent with her own treatment notes. (An ALJ may discount treatment notes that are inconsistent with an RFC form. *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)).

Most of Kozol's treatment notes discuss Smith's mental health, but there is no evidence that Kozol specialized in mental health treatment. According to Kozol, Smith's GAF always ranged between 50 and 55, while other professionals found a higher GAF. Her opinion was provided on a form that allowed for check marks to indicate the level of Smith's limitations. A treating physician's "Medical Source Statement," which consisted of a series of check marks assessing RFC, may be discounted as a conclusory opinion if it is contradicted by other objective medical evidence in the record. *Johnson v. Astrue*,

628 F.3d 991, 994 (8th Cir. 2011). *See also Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001) (An opinion in a checklist format that is general and incomplete limits the evidentiary value.)   In addition, "A treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements." *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996). Again, Kozol's form is contradicted by other objective evidence in the record. The ALJ did not abuse his discretion in failing to give any weight to Kozol's opinion.

**B.    Testimony of Smith's Sister**

Smith next argues that the ALJ erred by ignoring the prepared, written testimony of his sister about his alleged impairments. Lori Smith completed a third-party function report indicating that when Smith was depressed he would become isolative. If he was feeling better, he would make an effort to interact with both family and a small number of friends. (Tr. 230). She stated that Smith was prohibited from certain exercise because his back bothered him. He did his own chores and was able to do his own shopping. (Tr. 230). Lori said Smith had poor reading skills and never read books or newspaper articles. He attended church regularly. (Tr. 230). Smith liked to work with his hands and did well with fixing broken items like small electronics. (Tr. 231). When Smith was in a stressful situation, he became overwhelmed, immobilized, tearful, and withdrawn. (Tr. 231). Lori said criticism by employers fed into Smith's lack of self-worth. He did well with mentoring when he had the basic skills needed to accomplish a task. (Tr. 231). Lori stated that Smith had attention deficit disorder and that he could stay focused better with no pressure. (Tr. 232). She stated that Smith needed ongoing support and

encouragement to manage his daily living and that he struggled to function independently. (Tr. 232).

The ALJ found that statements made by Lori were not proof of disability. (Tr. 19). She was not medically trained to make exacting clinical determinations and observations of medical signs and symptoms or the frequency and intensity of Smith's moods and mannerisms. In addition, her statements were undoubtedly influenced by her affection toward Smith and natural tendency to believe and support him. Also, she was not a disinterested witness and had a financial stake in the outcome of the case. Most importantly, her statements were inconsistent with the preponderance of the opinions and observations by qualified medical personnel. (Tr. 20).

An ALJ is not required to accept a statement from a witness who will benefit financially from a determination of disability. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007). The court agrees with Smith that there is no evidence that Lori would benefit financially if Smith was found to be disabled. However, the ALJ's finding that Lori was not medically trained to give an opinion as to Smith's impairments was correct. In *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998), the court held that the ALJ properly rejected the lay testimony of the claimant's parents, who stated that the claimant could not work. The court stated that the parents' testimony was corroborative of the claimant's testimony. The same is true in the case at bar. Lori did not provide any information that had not previously been given by Smith.

It is true that witnesses such as family members may be the only persons who witness a claimant's difficulties. *Willcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008). The ALJ is not required to accept all lay testimony, but it may be error to ignore it. *Id.*

22

However, in this case, the ALJ did not ignore Lori's testimony—he merely noted that it was not proof of disability. (Tr. 19).

## C.   Evaluation of Pain

Smith next argues that the ALJ erred in failing to properly evaluate Smith's pain and in finding that his chronic back pain was not severe. The ALJ noted that Smith's back pain had improved with medication and weight loss and that the evidence failed to document that Smith demonstrated most of the signs typically associated with chronic, severe musculoskeletal pain, such as significantly abnormal x-rays, inflammatory signs, or bowel or bladder dysfunction. (Tr. 12). Smith was able to ambulate effectively and was able to perform fine and gross movements effectively. Thus, Smith had not established that the back pain imposed any significant limitations on his ability to perform basic work activities. (Tr. 12).

In finding that Smith did not have an impairment or combination of impairments that met the severity of impairments in the regulations, the ALJ noted that Smith had mild restriction in activities of daily living. (Tr. 14). He had no problems with hygiene and grooming, was able to perform household chores, and prepared simple meals. He had mild difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Tr. 14). He was able to use public transportation, drive an automobile, attend church, and participate in group activities at Community Alliance, which all required regular adherence to task with persistence and pace. He had experienced no episodes of decompensation. (Tr. 15).

Smith reported having been in a car accident in 2001 which he alleged resulted in back pain. (Tr. 308). At a physical assessment at Community Alliance in March 2009,

23

Smith reported low back pain, but he said he was unsure of its cause. (Tr. 344). At that time, he rated his health as nine on a scale of one to 10, with 10 being the healthiest. (Tr. 346). At a physical for disability purposes, Smith was able to walk without difficulty and could get up from a sitting to standing position. He was able to lie on the examining table and get up again. He did not express any pain behavior during the exam. (Tr. 436). Dr. Price's back exam showed that Smith's cervical, thoracic, and lumbar curves were within normal limits, and he had full range of motion. (Tr. 437). Dr. Price found no limitations in Smith's ability to move. (Tr. 438). X-rays of the lumbar spine found mild arthritic changes and mild chronic compressions. (Tr. 442). Dr. Hohensee also found that Smith had full range of motion and did not appear to be restricted by back pain. (Tr. 470).

At the second step of the five-step sequential evaluation, the ALJ must consider the medical severity of the alleged impairments. 20 C.F.R. § 416.920(a)(4)(ii). The impairment must be severe, meaning that it must "significantly limit[]" the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). *See also* 20 C.F.R. § 416.921(a) (describing non-severe impairments).

The ALJ in this case determined that Smith had three severe impairments: seizure disorder, depressive disorder, and marijuana dependence. (Tr. 12). The record supported the ALJ's finding. The medical evidence did not suggest that Smith's alleged back pain limited his mobility, strength, or any other type of functioning. In addition, the ALJ took the non-severe impairments into consideration when establishing the RFC by limiting Smith to medium work with some limitations.  There was no error in the ALJ's evaluation of Smith's pain.

D.      **Effect of Obesity**

Smith also argues that the ALJ erred in failing to consider the effect his obesity had on his ability to work. The ALJ stated that he considered the effect of Smith's obesity upon his ability to perform within the work environment and the combined effects of obesity with other impairments. (Tr. 14). The ALJ found that Smith did not testify and had not established that mild obesity had imposed any significant limitations on his ability to perform basic work activities. (Tr. 13-14).

Smith relies on SSR 02-1p to argue that the ALJ should have made an assessment of the effect of obesity on Smith's abilities. SSR 02-1p directs the manner in which obesity is considered as it relates to disability, noting that obesity was deleted from the listing of impairments in 1999. The policy states that obesity is considered in determining whether an individual has an impairment, whether it is severe, whether it meets or equals the requirements of a listed impairment, and whether it prevents the claimant from doing past relevant work and other work that exists in significant numbers in the national economy. Obesity will be considered a severe impairment when, alone or in combination with other physical or mental impairments, it significantly limits an individual's physical or mental ability to do basic work activities. SSR 02-1p.

This ruling addresses the possible effects of obesity, but it does not mandate a finding that obesity is a severe impairment. The ALJ followed the ruling and found that Smith's obesity did not significantly limit his ability to work. The court finds no error in the ALJ's finding.

E.      **Hypothetical Questions**

Next, Smith argues that the ALJ erred in failing to include accurate restrictions in Smith's mental health when asking the VE hypothetical questions.

At step four of the sequential evaluation process, the claimant retains the burden to prove he cannot perform his prior work. *Lewis v. Barnhart*, 353 F.3d 642, 648 (8th Cir. 2003).  In this case, the ALJ found that Smith could perform his past work as an auto detailer. (Tr. 20). If the claimant can perform any past relevant work, the ALJ must find him not disabled. 20 C.F.R. § 416.920(a)(4)(iv). To determine whether a claimant can perform his past relevant work, the ALJ must compare the claimant's RFC with the demands of his prior work. To aid in making this determination, the ALJ may consult a vocational expert. *See Lewis v. Barnhart*, *supra*. In this case, the ALJ found that Smith could perform his previous work, but because of other limitations, the ALJ moved to step five.

At the fifth step of the sequential evaluation process, the burden shifts to the Commissioner to show that the claimant can perform other work existing in significant numbers in the national economy. The ALJ considers the claimant's RFC, age, education, and work experience to determine if he or she can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). To meet this burden, an ALJ must question a vocational expert about a hypothetical person with the claimant's RFC. "Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007). If the hypothetical question "captures the consequences of [the claimant's] deficiencies" and

26

"describe[s] readily available occupations in which [he] could engage," the Commissioner has demonstrated the claimant's ability to perform work in the economy. *Id.*

The VE in this case testified that a hypothetical claimant with Smith's work experience and limitations could perform his past work as an auto detailer, and the ALJ found that Smith was not disabled at step four. (Tr. 20). The VE testified that Smith could perform work as a hospital cleaner, kitchen helper, garment sorter, housekeeper, and solderer. (Tr. 57-58). The ALJ determined that Smith could perform other work that existed in significant numbers in the national economy. (Tr. 21). Thus, even if Smith could not return to his past work, he would have been found to be not disabled at step five.

Smith argues that the hypothetical questions did not properly incorporate moderate limitations in concentration, persistence, or pace. However, the ALJ took into consideration Smith's concentration deficits by limiting him to simple work without detailed instructions. (Tr. 15). There was no error in the hypothetical questions presented to the VE.

## F.    Credibility of Smith's Testimony

The ALJ found that Smith's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 18). Smith argues that this finding is an abuse of discretion.

27

The ALJ noted several aspects of Smith's alleged impairments that were not supported by the record. Smith claimed he had poor eyesight, but the record did not document any evidence of inflammation, cataracts, glaucoma, diplopia, or blurred vision. Smith's visual acuity with glasses in September 2010 was 20/25 in the right eye and 20/20 in the left eye. (Tr. 13). He had not established that it was a severe impairment. (Tr. 13).

Smith also alleged disability due to a limited education level. The ALJ found that the evidence failed to contain any specific school records or evidence of a specific learning disorder. Smith's work history showed that he had performed a variety of unskilled and semi-skilled jobs without difficulty. Smith had not established his education level as a severe impairment. (Tr. 14).

In addition, Smith alleged an onset date of July 15, 2010, but the evidence did not document any specific medical event on that date. And Smith's work history was not consistent with the allegation of total disability. When Smith was employed, he had low earnings. The ALJ noted that one year of supplemental security income benefits at the full federal monthly rate would be competitive and greater than the earnings Smith achieved during his work years. The ALJ stated that such a scenario could motivate Smith, either consciously or unconsciously, to exaggerate his symptoms. The ALJ cited *Gaddis v. Chater*, 76 F.3d 893, 895-96 (8th Cir. 1996), in noting that complaints may be discounted if the claimant appears to be motivated for seeking disability benefits. (Tr. 18).

The ALJ also found that Smith's daily activities were restricted, if at all, by his choice and not by any apparent medical proscription. (Tr. 18). While he testified to

problems sitting, standing, and walking, he sat continuously throughout the hearing without difficulty and demonstrated no problem standing and walking into the hearing room. (Tr. 18). The record did not contain any evidence that Smith reported any specific, ongoing side effects from prescription medications. (Tr. 18-19).

The ALJ noted that there was no evidence of any inability to perform fine and gross movements effectively on a sustained basis. (Tr. 19). Smith moved his neck, shoulders, arms, hands, and fingers without noticeable difficulty and did not need to stand or walk around during the hearing. There was no documented evidence of nonexertional pain affecting the ability to maintain attention and concentration. (Tr. 19).

The ALJ found no documentation that there was any serious deterioration in Smith's personal hygiene, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended period of time. At the hearing, Smith displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance. (Tr. 19). Smith had a history of marijuana use, but he did not have a substance use disorder that was uncontrollable or that prevented the performance of substantial gainful activity. (Tr. 19). No doctor who treated or examined Smith stated or implied that he was disabled or totally incapacitated. And no doctor placed any specific long-term limitations on Smith's abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities. (Tr. 19). The ALJ gave considerable weight to the opinions of the non-examining state agency physicians, Dr. Hohensee and Dr. Reed, because they were consistent with the record as a whole. Great weight was given to the opinions of

Schmechel and Newman, who opined that Smith maintained the ability to perform a majority of work-related activities. (Tr. 20).

In the mental health exams, both Corey and Fudge found that Smith could handle simple instructions, relate appropriately to others, and adapt to changes in the environment. (Tr. 16, 311, 431). Their findings were consistent.

As for physical complaints, the ALJ found no evidence that Smith had difficulty walking or moving effectively based on musculoskeletal problems. (Tr. 19). "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006). Regulations provide that, in evaluating the intensity and persistence of a claimant's symptoms, such as pain, the agency considers all available evidence to determine the extent to which the symptoms limit the claimant's capacity for work. 20 C.F.R. § 416.929(c)(1). The objective evidence here from Dr. Price showed that Smith did not walk with a limp, retained full range of motion in every area tested, and had full strength. Dr. Price did not identify any limitations caused by lower back pain. (Tr. 437-439).

All of these findings can reflect on Smith's credibility. The question of the credibility to be attached to a claimant's testimony is ultimately to be determined by the ALJ, who is in the best position to make that decision. *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008). The court finds no error or abuse of discretion in the weight given to Smith's testimony by the ALJ. The decision was supported by the remainder of the record.

**G.    Ability to Engage in Full-Time Work**

Finally, Smith argues that the ALJ erred in determining that Smith's improvement while taking part in a structured program at Community Alliance meant that he would be able to engage in substantial gainful activity.

The ALJ noted that Smith regularly attended meetings and sessions at Community Alliance with some overall improvement. (Tr. 17). The ALJ reviewed the progress notes from Community Alliance and the report from a team leader which indicated that Smith regularly presented as focused, good-humored, and approachable, albeit with some symptoms of grief, tearfulness, and helplessness. (Tr. 18).

The ALJ stated that he was not providing a summary of all exhibits and evidence, but that all had been considered. "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). In addition, an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* There is no evidence to suggest that the ALJ determined that Smith was capable of working fulltime based on his participation in the Community Alliance program.

## V.    CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.    The Commissioner's decision is affirmed;

2.    The appeal is denied; and

3.      Judgment in favor of the defendant will be entered in a separate document.

Dated this 13th day of May, 2014

                                        BY THE COURT:

                                        s/Laurie Smith Camp
                                        Chief United States District Judge